UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

UNITED STATES OF AMERICA,

    -against-

DANIEL RIVERA,

        Defendant.

———————————————————————x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3|6|2020

19 Cr. 759 (CM)

## DECISION AND ORDER GRANTING A HEARING
## ON DEFENDANT'S MOTION TO SUPPRESS

McMahon, C.J.:

    Defendant Daniel Rivera is charged in the present indictment with two counts of

possession with intent to distribute cocaine base ("Crack"). He has filed a motion to suppress

the drug evidence law enforcement seized at the time of his arrest and later during a subsequent

search of his apartment.

    *The Government's Recitation of the Facts*

    According to the Government: Around midnight, June 5, 2019, three New York City

police officers were patrolling the Morrisania section of the Bronx in an unmarked police vehicle

(PO-1, the driver; PO-2, the front seat passenger; and PO-3, the rear seat passenger), when they

observed a livery car driving east along East 168th Street fail to signal when changing lanes and

turning right. Criminal Complaint at 2 (ECF No. 1). Given that part of their assignment that

evening was to be on the lookout for livery car robberies, PO-1 activated the lights and sirens and

pulled the livery car over. *Id.* Immediately after the lights and sirens activated, PO-1 and PO-2

observed defendant, looking back at them with bulging eyes; defendant moved frantically around

1

the rear seat, alternately leaning down towards his feet, and turning back to look at the officers. *Id.*

After the livery car came to a stop, PO-1 and PO-3 approached the driver's side of the car, and PO-2 approached the passenger side of the car. PO-2 stopped at the rear passenger side window, where he had a clear view of defendant. *Id.* at 2-3. PO-2 saw defendant leaned down toward his feet, then sit up and place a black plastic bag into a fast-food takeout box. *Id.* PO-2 recognized defendant from previous encounters. *Id.* PO-2 told defendant "to keep your hands where I can see them," and asked him, "What's in the bag in the box?" *Id.* Defendant stated in substance, "just a little bit of weed." *Id.* PO-2 directed defendant to get out of the car and escorted him to the rear of the vehicle. PO-2 left defendant at the back of the car with the other officers while he went back and retrieved the fast-food takeout box from the rear passenger seat compartment; he opened the container and found a black plastic bag with what appeared to be crack in it. Subsequent lab tests would confirm that the bag contained approximately 100 grams of crack. *Id.*

Defendant was placed under arrest.

The officers brought defendant back to the station house for processing. There he was charged with Criminal Possession of a Controlled in the Seventh Degree, in violation of New York Penal Law § 220.03, a misdemeanor, and issued a desk appearance ticket, requiring him to appear for arraignment in Bronx Criminal Court, on August 14, 2019. Defendant failed to appear on that date and an arrest warrant issued. *See* N.Y.S. Dep't of Crim. Justice Services Repository Inquiry for Daniel Rivera at Cycle 11.

On August 20, 2019, the United States Attorney's Office agreed to take the case from the state, swearing out a complaint in magistrate's court that charged defendant with one count of

possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B. The magistrate issued an arrest warrant based on the new federal charge.

On August 22, 2019, NYPD officers arrested defendant at his apartment pursuant to the federal warrant. Immediately thereafter, two parole officers, with the assistance of NYPD police officers, searched the defendant's residence. They found *inter alia* more than 30 vials containing a white, rock-like substance (which would subsequently test positive for crack), multiple digital scales, other drug paraphernalia, and an ammunition magazine for a firearm. *See* NYPD Arrest Report B19634854 dated Aug. 22, 2019; (NYPD Invoices 2000900460, 2000900463, 2000900467, and 2000900470 dated Aug. 22, 2019; NYPD Laboratory Report 2019-056860). Government Memorandum in Opposition at 2-5.

*Rivera's Affidavit*

In an affidavit filed in support of his motion, Rivera claims *inter alia* that police officers stopped the livery cab "for what appeared to me for no apparent reason." From that point on, Rivera's version of events leading to his arrest on June 17, 2019, pretty much track that of the officers:

> One of the police officers came to me and ordered me to keep my hands where he could see them; I had in my possession a fast food takeout box; the officer asked me what was in the bag and I responded; I was then told to step out of the cab and ordered to go to the rear of the cab; the officer then went into the cab, searched it, retrieved the takeout box and opened it; as a result , I was charged with possession of crack cocaine; I was committing no crime in the presence of the police; I did not consent to a search of the cab or my person; I expected that my person and the area of the cab I was in were private; I believed that when the orders to keep my hands in view and then to go to the rear of the cab, I was in the custody of the police, had no choice but to obey them, and could not walk away; I was not advised of my 'Miranda' rights before I was questioned."

Rivera Affidavit at 1.

3

Regarding his arrest on August 20, 2019, at his apartment, Rivera says *inter alia*:

> I was arrested in my home; I was on New York State parole; two parole officers came to my home in the company of law enforcement officers; these officers conducted a search of my home; they went into closed and concealed areas, opened up a black bag, and went into drawers; as a result , I was charged with and later indicted for possession of controlled substances; this search was not based upon reasonable suspicion or probable cause.

*Id.* at 2.

### *The June 17 Arrest*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Therefore, traffic stops must satisfy the Fourth Amendment's reasonableness limitation, which "requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2009).

Rivera has raised a disputed question of fact regarding the lawfulness of the police stop of the livery cab that led to his arrest. The police say they pulled the car over because the driver failed to signal when changing lanes and when turning. Rivera says the car was stopped for "no apparent reason." The Government concedes that it would be appropriate for the Court to hold a hearing to resolve this factual dispute. However, the Government says that "[o]nce reasonable suspicion of a traffic violation is established through an evidentiary hearing, the Court can rule

4

on the existing record, as a matter of law, that the evidence seized in connection with the car stop was lawfully obtained. Well, maybe.

If the absence of reasonable suspicion of criminal activity, a traffic stop can only last as long as it takes to "address the traffic violation that warranted the stop" and "attend to related safety concerns." *Rodriguez v. United States*, 135 S.Ct. 1609, 1616 (2015). That said, "information lawfully obtained during [a traffic stop] may provide [an] officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation." *United States v. Figueroa–Espana*, 511 F.3d 696, 702 (7th Cir. 2007) (citations omitted). And the automobile exception" allows police to conduct a warrantless search of a "readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004); *see also United States v. Howard*, 489 F.3d 484 (2d Cir. 2015) at 492 (same).

In the present case we have a traffic stop, police questioning into a matter unrelated to the traffic stop, and a warrantless search of a container within a vehicle. Accordingly, the Court will hold a hearing to resolve the factual dispute defendant has raised in his affidavit and require the Government to defend the lawfulness of the officer's actions at each stage of the encounter: the stop of the livery car, PO-2's questioning of defendant, PO-2's search of the bag found in the vehicle, and ultimately the arrest of defendant.

*The Parole Search*

When defendant was arrested for possession of crack in July of 2019, he was on New York State Parole. At the time of his release from prison in 2018, defendant acknowledge and agreed that as a condition of his release, Parole authorities had a right to search his premises

without a warrant. *See* Government Memorandum in Opposition, Exhibit A, Certificate of

Release to Parole Supervision (Executed by defendant on November 9, 2018). Nonetheless,

defendant has moved to suppress the fruits of just such a parole search.

Under New York State law, the determination as to whether a warrantless parole

search "was unreasonable and thus prohibited by constitutional proscription must turn on

whether the conduct of the parole officer was rationally and reasonably related to the

performance of the parole officer's duty." *People v. Huntley,* 43 N.Y.2d 175, 181 (1977).

Under federal law, as established by the Second Circuit:

> the New York rule [articulated in *Huntley* ] is coextensive with the requirements
> of the Fourth Amendment. A rule indicating that a search of a parolee is
> permissible so long as it is reasonably related to the parole officer's duties is
> identical to a rule that parole officers may conduct searches so long as they
> comport with the Fourth Amendment. This is because the doctrine of "special
> needs" permits those searches that are reasonably related to the special needs
> animated by management of a parole system.

United States v. Grimes, 225 F.3d 254, 259 n. 4 (internal citation omitted) (citing *Chandler v.*

*Miller,* 520 U.S. 305, 313–14 (1997)). Proper management of a parole system includes a

mandate to investigate whether a parolee is violating the conditions of his parole, one of

which is that the parolee commit no further crimes. *United States v. Barner*, 666 F.3d 79, 85

(2d Cir. 2012).

Here, Parole Officers learned that defendant had been rearrested on narcotics charges

on July 17, 2019—the ultimate parole violation. Based on that information, the Parole

Officers had a duty to investigate further. Thus, their search on August 22, 2019, satisfied the

reasonable relationship requirement of *Huntley* because it was performed in direct response to

the information that defendant was engaged in new criminality. *See United States v. Barner*,

6

666 F.3d 79, 85 (2d Cir. 2012).

In regard to defendant's argument that involvement by city police in the parole search voided the special needs exception, the Second Circuit "ha[s] squarely rejected the 'argument that police assistance during an otherwise reasonable warrantless search by parole officers thereby invalidates the search.'" *United States v. Lambus*, 897 F.3d 368, 409 (2d Cir. 2018) (quoting *United States v. Newton*, 369 F.3d 659, 662 (2d Cir. 2004). And contrary to defendant's argument to the contrary, there is no requirement that defendant's assigned parole officer must conduct any parole search of his premises. *See, e.g.*, *People v. Van Buren*, 198 A.D.2d 533, 534 (2d Dep't 1993) (addressing a defendant's argument that "because the arrest and [parole] search were not conducted by his parole officer" the search was unlawful and holding that "[b]y dint of the detective's assignment to the Parole Task Force, whose job it was to locate parole absconders, and the fact that the purpose of the visit to the defendant's residence was to make an arrest under a warrant for parole violation, no relevant distinction exists between the detective and the defendant's parole officer").

Accordingly, there is no need to conduct a hearing as to the August 22, 2019 search, and defendant's motion to suppress the fruits of that search is denied.

The hearing regarding the July 17, 2019 incident will be held on March 18, 2020, at 2:00 p.m.

This constitutes the decision and order of the Court

March 6, 2020

Chief District Court Judge

7

BY ECF TO ALL COUNSEL

8